## COOPER TIRE AND RUBBER COMPANY
### v.
### The UNITED STATES.
#### Cong. No. 10–52.

United States Court of Claims.
May 8, 1957.

Thurman Hill and James M. Barnes, Washington, D. C., for plaintiff. Eugene Carusi, Washington, D. C., was on the brief.

William A. Stern, II, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant. Edgar H. Brenner, Washington, D. C., was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LITTLETON, Judge.

This case comes before the court pursuant to House Resolution 699 of the 82d Congress, 2d Session, July 1, 1952, which provides as follows:

"Resolved that the Bill (H. R. 8255) entitled "A Bill for the relief of the Cooper Tire & Rubber Company" now pending in the House of Representatives, is hereby referred to the United States Court of Claims pursuant to Sections 1492 and 2509 of Title 28 United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of such sections and report to the House, at the earliest practical date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equi-

table, against the United States, and the amount, if any, legally or equitably due from the United States to the claimants: Provided, That it shall not be a defense on the part of the Government that the acts of the Government which are alleged to have damaged the claimant were done by the Government in its sovereign capacity."

The bill (H. R. 8255) referred to in the above resolution proposed to pay to the Cooper Tire and Rubber Company the sum of $1,811,333.38 in full satisfaction of all claims against the United States for losses suffered by the plaintiff under seven contracts entered into between the plaintiff and the United States. It is the duty of this court to determine whether or not, in view of the facts, the plaintiff has either a legal or equitable claim for which it should be compensated and, if so, in what amount.

Plaintiff is a corporation organized under the laws of the State of Delaware with its principal place of business in Findlay, Ohio, where it is, and has been for many years, engaged in the manufacture of rubber tires, tubes and other rubber products. Plaintiff employs between 900 and 1,000 persons.

During 1950, plaintiff, in response to invitations to bid issued by the Department of the Army, submitted bids and was awarded certain contracts for the manufacture of rubber tires, tubes and camelback (camelback being a rubber product used in recapping tires). It is with respect to seven contracts awarded during 1950 that plaintiff has sought relief. Five of the seven were awarded prior to the outbreak of the Korean hostilities on June 25, 1950, and the other two were awarded on June 30, 1950, and November 17, 1950, respectively. These seven contracts were of the fixed-price type and did not contain escalator clauses to protect against increased costs to the contractor. During the calendar years 1950, 1951, and 1952, in which deliveries were made upon the seven contracts which are the subject of this claim, the plaintiff was awarded 28 other contracts with the defendant. One of them was awarded April 7, 1950, and delivery thereon was completed June 14, 1950. This contract did not contain the escalator clause. The other 27 contracts were issued during 1951 and 1952. All of them were fixed-price contracts, but each of them contained the escalator clause providing a price adjustment upward or downward on the basis of costs of production. The plaintiff made a small profit on deliveries under all Government contracts during the three-year period. Plaintiff contends, however, that only the seven contracts for which it has sought relief should be considered here and that on this basis it has suffered to the extent of $1,811,333.38 representing increased costs occasioned by the Korean War together with loss of profits.

There is no question that the losses sustained by the plaintiff on the seven contracts arose from the fact that the Korean War brought about an increase in the cost of material needed by the plaintiff to perform the rubber contracts. The only question is whether such loss results in a legal or equitable claim against the United States.

After the outbreak of the Korean War, the cost of labor, rayon, synthetic and natural rubber increased at an abnormal rate. The plaintiff had to have rayon converted into rayon cord to be used in the manufacture of its tires. The conversion was done for the plaintiff by the Dearing Milliken Company. From July 1950 to December 1950, the rayon fabric price increased from 54 cents a pound to 62 cents and the cost of cord conversion from 10½ cents to 15 cents. During much of this period rayon fabric was in short supply and the defendant's officials did what they could to find a supplier for the plaintiff even though there was no such obligation on the part of the defendant under the contract.

Wage increases were negotiated with the United Rubber Workers Union and approved throughout the rubber industry. On September 18, 1950, union workers were granted an increase of five cents an hour. On November 6, 1950, an addi-

tional six cents was agreed upon and again on September 17, 1951, they were given an additional twelve cents an hour. The increased cost to the plaintiff occasioned by the higher costs of rayon and its conversion into cord and the wage increases, are not separately determinable with respect to the seven contracts, which are the subject of this claim, but these items did create substantial increased costs for the performance of the contracts.

Synthetic rubber during the period of plaintiff's performance was purchased solely from the Reconstruction Finance Corporation, Office of Rubber Reserve. Prior to December 7, 1950, the price for the grade of synthetic rubber used by the plaintiff was 18½ cents a pound. After December 7, 1950, the price was increased by the RFC to 24½ cents a pound, and effective in September 1951 the price was further increased to 26 cents a pound. Higher costs of raw materials used in the synthesis of rubber and the necessity of overcoming uneconomical operations of synthetic rubber plants caused the RFC to raise the price of synthetic rubber. By applying the price increases of synthetic rubber to the quantities required and delivered to the plaintiff after December 6, 1950, for use in producing the rubber products called for in the seven contracts, the total increase thereof is found to be approximately $213,182.51.

The price of natural rubber began to increase on the market in the first half of 1950 due to the lack of enough natural rubber on the world market to supply the demand. General Services Administration bought on the market, in accordance with directives received from the Munitions Board, in order to complete United States stockpile objectives. Buying by GSA and private purchasers contributed to the increased price in the undersupplied rubber market.

Within six weeks following the outbreak of the Korean War the spot market price of natural rubber had increased from about 28 cents a pound to about 64 cents. In August 1950, a Presiden-

tial directive authorized the National Production Authority to impose controls upon the industry in order to limit the monthly quantities of rubber that manufacturers could consume. The limit authorized to each manufacturer or consumer was based upon a formula determined by the consumer's base period consumption. GSA went into the market to acquire the balance of rubber available to the United States in the world market. By November 1950, the New York spot price for natural rubber had reached 91 cents a pound. On December 29, 1950, GSA became the exclusive importer and seller of crude natural rubber in the United States. The purpose of this was to avoid competitive bidding on the world market between the consumers of rubber. All outstanding contracts for future deliveries of rubber were honored by GSA. Finally, in April of 1951, the price of rubber began to drop when fareastern rubber suppliers offered their rubber for sale to the GSA. GSA continued a buying policy that tended to reduce the price of rubber on the world market until about March 1952, when it announced that a free market would be permitted again effective the first day of July 1952.

The activities of the GSA in the rubber market were designed to protect the United States consumers and the national defense requirements for crude natural rubber. Had GSA not stepped in and become the sole importer of natural rubber there seems little doubt that competition for the existing supply of rubber would have forced the prices considerably higher than those paid to GSA.

Prior to the Korean War the plaintiff had purchased considerable quantities of natural rubber on a forward basis. This is the usual procedure in the rubber business and contracts for delivery are made from three to eighteen months in advance depending upon the view of the market by the dealer and his ability to obtain firm commitments at the source of supply. Before July 1950, the plaintiff had purchased approximately 90 percent of its scheduled requirements for the re-

mainder of 1950. There is no way of determining if the forward purchases made by the plaintiff were intended for its military or civilian contracts. If the plaintiff at the time it was awarded the bids on the seven contracts had purchased forward in such quantity to enable it to meet the rubber requirements under the contracts, it would have sustained a loss due to increases in the price of natural rubber of only $6,891.88, representing the difference in the price of natural rubber between the time plaintiff entered its bids and the date of awarding the contracts. By using the cost per pound of rubber as determined monthly from invoices for deliveries during each month of rubber deliveries during the time that production was performed on the seven contracts, and the cost per pound at the time that plaintiff prepared its bids on the seven contracts, the increased cost of natural rubber amounted to $349,731.11.

Faced with the rising cost of its production under the seven Government contracts, plaintiff decided to cut back government contract production in an attempt to offset these losses with an increase in civilian production which was much more profitable. Upon the passage by Congress of the amendment to the First War Powers Act, January 12, 1951, 64 Stat. 1257, 50 U.S.C.A.Appendix, § 611, the plaintiff discussed with the Cleveland Ordnance District, which had awarded plaintiff the seven contracts, the requirements for filing claims for financial relief under the Act. Plaintiff was advised that only in the case where a threatened loss by a contractor would adversely affect the interest of the Government would an existing contract be amended without consideration as provided for in the Act.

In March 1951, the plaintiff presented a claim under the First War Powers Act, as amended, to the Cleveland Ordnance District for $1,077,720. After a review of the claim the district contracting officer recommended that increases totalling $1,075,407.25 be allowed plaintiff. This recommendation was concurred in by the Cleveland District Board of Review which recommends to the district contracting officer on any claim over $100,-000. Accompanied by the concurring recommendation of the Board of Review, the recommendation of the contracting officer for relief to plaintiff in the amount of $1,075,407.25 was forwarded through Detroit Headquarters to Washington, D. C., where it was assigned to the Claim Section, Department of Ordnance. A hearing before the Army Ordnance Board was held and the plaintiff's claim was rejected. From this decision an appeal was taken to the Office of the Under Secretary of the Army which resulted in another hearing before the Army Ordnance Board. On this second hearing the decision was also adverse to the plaintiff. Through the efforts of the Special Assistant to the Under Secretary of the Army, plaintiff's claim was taken to the Army Contracts Adjustment Board. The Adjustment Board found against the plaintiff and based its decision, to some extent, upon a finding that plaintiff was not on the verge of bankruptcy and, in part, that plaintiff's claim was not the result of a net loss when *all* Government contracts were considered. There is some evidence that the Board feared possible criticism and a possible "epidemic effect" with respect to other potential claimants if this claim should be allowed.

In 1950, the plaintiff was in critical financial condition, since its working capital was less than $1,000,000 and it was committed to approximately $6,000,000 in Government contracts and about the same in civilian work. This condition has substantially continued to this day. The normal turnover of its working capital could not possibly meet plaintiff's contractual commitments and it was therefore required to borrow substantial sums for additional working capital for which it pledged its accounts receivable.

In computing plaintiff's net loss on the seven contracts the defendant made a complete audit of plaintiff's records for the three-year period 1950, 1951, and 1952. The seven contracts here in question had a performance period from April

1950 to May 1952. Certain general expenses and nonoperating expenses were excluded by the Government audit from the costs properly allocable to the seven contracts and were allocated to civilian business. These items are set forth in detail in finding 23. On the seven contracts for which claim is made, the plaintiff's net billings for the delivery period from April 1950 through May 1952 were $5,843,816.15. By eliminating all of the expense items transferred by the defendant's accountants from Government contracts to civilian business, the plaintiff's net loss on these seven Government contracts was $959,751.11. During the same period the plaintiff made civilian deliveries of $26,548,951.94 on which it realized a profit of $2,516,760.74, representing 9.48 percent of net sales. By applying this percentage to the Government deliveries on the seven contracts, plaintiff's profit would be $553,993.77.

If the contracts here in question had contained an escalator clause, which was contained in substantially all contracts for tires and tubes made by the Cleveland Ordnance District after November 17, 1950, the date the last of the seven contracts were entered into, the plaintiff would have received approximately $3,800,000 in addition to the amount it did receive under these contracts.

■ In determining whether the plaintiff is entitled to any equitable adjustment, consideration will be given to other contracts entered into between the plaintiff and the defendant during the period of performance on the seven in suit. Upon the total of 35 Government contracts entered into between the plaintiff and the defendant during the period 1950 through 1952, the plaintiff realized a profit of $64,363.41 or 0.043 percent on net billings. This compares to a 7.903 percent profit on a total of $31,786,405.41 in civilian business. If the plaintiff had realized a net profit on all its Government contracts at the same percentage as its civilian business it would have had a profit of $1,171,904.61 as compared to the $64,363.41 it realized, or a difference of $1,107,541.20.

If a proper proportion of the amount of the general and non-operating expenses transferred by the Government's accountants from Government contracts to civilian contracts (finding 23) is allocated to the Government contracts, the net profit on all Government business would be substantially eliminated because the amount allocable to the seven contracts would be approximately $64,000 and thereby all but eliminate the $64,363.41 overall profit.

If the consideration of the other Government contracts is limited to net billings actually made during the period of performance for the seven contracts upon which suit has been brought, and for which the deliveries were completed about the middle of May 1952, then the plaintiff would have had a net loss on all Government contracts as of that time in the amount of $511,218.43. By applying the profit ratio of 9.48 percent earned on its civilian business during this same period, the plaintiff would have realized a profit of $927,892.88 on net billings of $9,787,899.54 for the period April 1950 through May 1952. Therefore the sum of $1,439,111.31 would be required to equalize its Government business with its civilian business for this period.

■ There is nothing in the facts as presented to this court which gives rise to a legal or equitable claim in a juridical sense against the Government and the plaintiff does not assert one. Even construing the rules of law applicable hereto liberally in favor of the claimant, there is nothing in the facts which in our opinion gives rise to an equitable obligation on the part of defendant to reimburse plaintiff for its losses. If this case had arisen as a result of plaintiff's World War II contracts and only the seven contracts had been considered, plaintiff might have had a valid claim under the Lucas Act (60 Stat. 902, as amended, 62 Stat. 992, 41 U.S.C.A. § 106 note), but no similar legislation has been enacted for Korean War contractors and the only similar relief available to plaintiff was under the amendment to the First War Powers Act. Such relief was not granted as a matter of right, however, and de-

nial of such relief gives rise to no legal or equitable claim.

In view of the facts of record in this case it appears to us that plaintiff presented a most appealing case for First War Powers Act relief with respect to the seven contracts, and responsible and experienced Government officials recommended that such relief be granted. The decision at the highest level of review to deny the relief requested appears to have been reached as a matter of policy and we are without authority to review such decision, although we feel at liberty to express our opinion that it was a harsh one. Whether plaintiff should now be reimbursed, in whole or in part, for its losses on the seven contracts is for Congress to determine on the facts.

Regardless of which accounting period is chosen, and regardless of whether one views plaintiff's situation from the point of view of only the seven contracts or of all 35 of its Government contracts, it appears that plaintiff fared very poorly on its Government business during the Korean War period. It avoided bankruptcy and remained in business only because of its civilian business during that period, of which the Government should not take advantage, and as a result of its Government contract work it has been unable to purchase much needed new equipment, has lost business because of this circumstance, and is in a comparatively precarious financial condition today. Whether, under these circumstances, Congress wishes to provide for some monetary relief to the plaintiff is, of course, a question for Congress alone.

### Conclusion

Our conclusion is that the plaintiff has no claim, legal or equitable, of a kind which could be enforced in court. The opinion, findings of fact, and conclusions reached will be certified to Congress pursuant to House Resolution 699, 82d Congress, 2d Session, adopted July 1, 1952.

JONES, Chief Judge, and LARAMORE, MADDEN and WHITAKER, Judges, concur.

**CASPERS TIN PLATE COMPANY**

v.

**The UNITED STATES.**

No. 470–54.

United States Court of Claims.
May 8, 1957.

